Michael G. Doan, SBN 175649
Doan, Levinson, & Liljegren, LLP
2850 Pio Pico Drive, Suite D
Carlsbad, CA 92008
Phone (760) 450-3333 • Fax (760) 720-6082
mike@dllfirm.com

Attorney for Betty Jean McCarther-Morgan

# UNITED STATES BANKRUPTCY COURT

## Southern District of California

| | |
|---|---|
| In re: | Case No    07-04817-JM |
| Betty Jean McCarther-Morgan, | Chapter    13 |
|     Debtors, | |
| _____ | PETITIONERS' SAFE HARBOR NOTICE AND MOTION FOR 9011 SANCTIONS |
| Betty Jean McCarther-Morgan, | |
|     Petitioner, | |
| vs. | DATE: TBD |
| Asset Acceptance LLC, | TIME: TBD |
|     Respondent. | DEPT: |
| _____ | |

TO:    Asset Acceptance LLC

PLEASE TAKE NOTICE that should you fail to withdraw your Proof of Claim in the above referenced case at least 21 days after service of this Notice and Motion, it may be filed with the Court and calendared for a hearing, and Betty Jean McCarther-Morgan ("PETITIONER,") may seek sanctions against you, pursuant to FRBP 9011. The basis for this Motion is that this is a non-existing debt and you are not a creditor in Petitioner's Bankruptcy.  Moreover, the proof of claim was filed without standing, is past the two and four year statute of limitations, and any such debt would have been previously discharged.

Dated:    October 29, 2007

Respectfully Submitted,
DOAN, LEVINSON, & LILJEGREN, LLP
By: _/s ecf Michael G. Doan_
Michael G. Doan, Attorney for PLAINTIFFS

1  Michael G. Doan, SBN 175649
   Doan, Levinson, & Liljegren, LLP
2  2850 Pio Pico Drive, Suite D
   Carlsbad, CA 92008
3  Phone (760) 450-3333 • Fax (760) 720-6082
   mike@dllfirm.com
4

5  Attorney for Betty Jean McCarther-Morgan

6

7                    UNITED STATES BANKRUPTCY COURT

8                       Southern District of California

9
   In re:                              )   Case No    07-04817-JM
10                                      )
   Betty Jean McCarther-Morgan,         )   Chapter    13
11                                      )
          Debtors,                      )
12  _____)
                                        )   MEMORANDUM OF POINTS AND
13  Betty Jean McCarther-Morgan,        )   AUTHORITIES
                                        )
14                                      )
          Petitioner,                   )   DATE: TBD
15                                      )
    vs.                                 )   TIME: TBD
16                                      )
    Asset Acceptance LLC,               )   DEPT:
17                                      )
          Respondent.                   )
18                                      )
   _____)
19

20        Betty Jean McCarther-Morgan ("PETITIONER"), hereby submits the following points and

21  authorities in support of their Motion for Sanctions under 9011 against Asset Acceptance LLC

22  ("RESPONDENT").

23                                      **FACTS**

24        PETITIONER filed for Chapter 13 relief on September 29, 2007.  In response to said filing,

25  RESPONDENT submitted a Proof of Claim with the United States Bankruptcy Court.  The alleged

26  debt is completely unknown to the petitioner and neither Asset Acceptance LLC or Bank of America

27  were listed in the Bankruptcy schedules.

28        Moreover, the Proof of Claim was not signed by an officer of RESPONDENT and no

                                           2

1    payment history between the PETITIONER and RESPONDENT was provided.  The alleged debt for

2    the proof of claim admits the date the debt was incurred was "12/09/94"  which is over four years

3    old.  PETITIONER disputes the liability, amount, and entire debt in question to RESPONDENT.

4    PETITIONER alleges that RESPONDENT purposely did not serve the proof of Claim on the

5    PETITIONER and PETITIONER'S counsel.

6         In response to the proof of claim, PETITIONER filed an objection on October 29, 2007 and

7    mailed the same against the RESPONDENT that same day.

8                                **RELEVANT LAW**

9    **Bankruptcy Code §502** states in relevant part:

10        *"(a) **A claim or interest, proof of which is filed under section 501** of this title, **is***

11        ***deemed allowed,** unless a party in interest . . . objects.*

12        *(B)Except as provided [in inapplicable subsections], if such objection to a claim is*

13        *made, **the court,** after notice and a hearing, shall determine the amount of such claim*

14        *in lawful currency of the United States as of the date of the filing of the petition, and*

15        ***shall allow such claim** in such amount, **except to the extent that --***

16        *(1) **such claim is unenforceable against the debtor and property of the debtor,***

17        ***under any agreement or applicable law** ..."*

18        *The basic federal rule in bankruptcy is that state law governs the substance of claims,*

19    Raleigh v Ill Dep't of Revenue, *530 U.S. 15, 19 (1951).*

20        **Cal. Code Civ. Proc § 337** states:

21        *"Written obligation; Four years*

22        *Within four years:*

23            *1. An action upon any contract, obligation or liability founded upon an*

24            *instrument in writing, except as provided in Section 336a of this code;*

25            *provided, that the time within which any action for a money judgment for the*

26            *balance due upon an obligation for the payment of which a deed of trust or*

27            *mortgage with power of sale upon real property or any interest therein was*

28            *given as security, following the exercise of the power of sale in such deed of*

trust or mortgage, may be brought shall not extend beyond three months after the time of sale under such deed of trust or mortgage.

2. An action to recover (1) upon a book account whether consisting of one or more entries; (2) upon an account stated based upon an account in writing, but the acknowledgment of the account stated need not be in writing; (3) a balance due upon a mutual, open and current account, the items of which are in writing; provided, however, that where an account stated is based upon an account of one item, the time shall begin to run from the date of said item, and where an account stated is based upon an account of more than one item, the time shall begin to run from the date of the last item."

**Cal. Code Civ. Proc § 339** states in part:

Within two years:

1. An action upon a contract, obligation or liability not founded upon an instrument of writing, except as provided in Section 2725 of the Commercial Code or subdivision 2 of Section 337 of this code.

**FRBP 3001** states in part:

" Proof of Claim

(a) Form and content. A proof of claim is a written statement setting forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official Form.

(b) Who may execute. A proof of claim shall be executed by the creditor or the creditor's authorized agent except as provided in Rules 3004 and 3005.

(c) Claim based on a writing. **When a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.**"

**The Official Proof of Claim Form** states:

"Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoiced, itemized statements of running accounts, contracts,

1  *court judgements, mortgages, security agreements, and evidence of perfection of*

2  *lien... If the documents are not available, explain.  If the documents are voluminous,*

3  *attach a summary."*

4  **Local Bankruptcy Rule 1002-1(a)** states:

5  *"CORPORATIONS AND UNINCORPORATED ASSOCIATIONS.*

6  *Corporations, unincorporated associations and partnerships may not file a*

7  *petition or otherwise appear except through an attorney in any case or proceeding,*

8  *except for filing a proof of claim or a reaffirmation agreement.* ***Such a proof of claim***

9  *or reaffirmation agreement* ***must be signed by an officer of the corporation, partner***

10  ***of the partnership, or member of the unincorporated association."***

11  **Local Bankruptcy Rule 3002-2** states:

12  *"Proof of claims filed in a chapter 13 case shall be served on the chapter 13 trustee,*

13  *debtor and debtor's counsel."*

14  **Federal Rules of Bankruptcy Procedure 9011provides:**

15  *(b) Representations to the court*

16  *By presenting to the court (whether by signing, filing, submitting, or later advocating)*

17  *a petition, pleading, written motion, or other paper, an attorney or unrepresented*

18  *party is certifying that to the best of the person's knowledge, information, and belief,*

19  *formed after an inquiry reasonable*

20  *under the circumstances,--*

21  *(1) it is not being presented for any improper purpose, such as to harass or to cause*

22  *unnecessary delay or needless increase in the cost of litigation;*

23  *(2) the claims, defenses, and other legal contentions therein are warranted by existing*

24  *law or by the nonfrivolous argument for the extension, modification, or reversal of*

25  *existing law or establishment of new law,*

26  *(3) the allegations and other factual contentions have evidentiary support or, if*

27  *specifically so identified, are likely to have evidentiary support after reasonable*

28

1    *opportunity for further investigation or discovery; and*

2    *(4) the denials of factual contentions are warranted on the evidence or, if specifically*

3    *so identified, are reasonably based on a lack of information and belief.*

4    *(C) Sanctions*

5    *If, after notice and a reasonable opportunity to respond, the court determines that*

6    *subdivision (b) has been violated, the court may, subject to the conditions stated*

7    *below, impose an appropriate sanction upon the attorneys, law firms, or parties that*

8    *have violated subdivision (b) or are responsible for the violation.*

9                    **APPLICATION OF LAW TO PROOF OF CLAIM**

10           In this case, RESPONDENT admits in the proof of claim that the debt was incurred on

11   "12/09/1994," which was over four years old when RESPONDENT filed the proof of claim.

12   RESPONDENT'S proof of claim is beyond the California statue of limitations (Cal. Code Civ. Proc.

13   337 and 339) because it is over two and/or four years old and is thus unenforceable against the

14   debtor or property of the debtor pursuant to 11 USC 502(b)(1).  Subsequently, the RESPONDENT

15   knew the debt was not enforceable under California law and yet filed the proof of claim in an attempt

16   to collect a debt not enforceable by law.

17           RESPONDENT also does not have standing to file a proof of claim because they have not

18   provided any documents or other evidence of an agreement between PETITIONER and

19   RESPONDENT; nor has RESPONDENT provided any documents from Bank of America where

20   Bank of America has acknowledged the transfer of said accounts to RESPONDENT.

21   RESPONDENTS failure to provide this legal connection means that RESPONDENT is not the real

22   party in interest under California law of the Federal Rules of Civil Procedure 17(a).  As such the

23   proof of claim is unenforceable against the debtor or property of the debtor pursuant to 11 USC

24   502(b)(1).

25           PETITIONER'S debt to RESPONDENT would have been previously discharge in

26   Bankruptcy. PETITIONER filed for Bankruptcy on 5/16/2002 Case No. 02-24403-KM.  The trustee

27   reported a "no asset case."  On 8/26/2002 the PETITIONER received a discharge.   Bank of America

28

                                                    6

1   may not have been specifically listed as a creditor in the bankruptcy proceeding, but a discharge of

2   her debt was granted nevertheless.  Under the holding of <u>In Re Gilbert G. Breezley</u>, 994 F.2d 1433,

3   the debt of the  PETITIONER is considered an omitted debt covered by 11 USC 523(a)(3)(A) and

4   was therefore discharged pursuant to 11 USC 727 on 8/26/2002.

5        Lastly, the Fair Debt Collections Practices Act (FDCPA) provides under 15 USC 1692(f)

6   that a debt collector is liable for statutory damages, actual damages, and attorney fees and costs, if

7   litigation takes place on a time-barred debt.[1]  In fact, the District Court for the Northern District of

8   California recently held that the mere threat in a letter to litigate on a time barred debt violated the

9   FDCPA.[2]  While the FDCPA only applies to third party bill collectors, the California Rosenthal Act,

10   incorporates 1692(f) to apply to all creditors.[3]  Accordingly, the Proof of Claim not only is

11   unwarranted under existing law, but also violates other State and Federal Laws.

### SANCTIONS UNDER 9011

13        The proof of claim clearly violates Bankruptcy Rule 9011.  Since it clearly can not be

14   collected upon, its only purpose is to harass or to cause unnecessary delay or needless increase in the

15   cost of litigation.  The claim for money due is not enforceable and therefore not warranted by

16   existing law or by the nonfrivolous argument for the extension, modification, or reversal of existing

17   law or establishment of new law.  The allegations and other factual contentions that they are owed

18   money, are a party in interest, that the claim is enforceable, that it is not barred by the statue of

19   limitations, and entitled to payment, have no evidentiary support and do not even comply with

20   Bankruptcy Rule 3001.

---

[1] *Kimber v. Federal Financial Corp.*, 668 F. Supp. 1480, 1987 U.S. Dist. LEXIS 7929 (M.D. Ala. 1987)

[2] *Perretta v. Capital Acquisitions & Mgmt. Co.*, 2003 U.S. Dist. LEXIS 10070 (N.D. Cal. May 5, 2003)

[3] California Civil Code 1788.17

Moreover, case law is clear that Bankruptcy Rule 9011 may apply to improperly brought proof of claims.[4]

Indeed, the actions of Asset Acceptance LLC in this case are no different than *the actions of B-Line in In Re: Wingerter* Case No. 06-50120, Northern district of Ohio, Easter Division, 2007 Bankr. Lexis 3330, and which is attached hereto as "**EXHIBIT A**"

## CONCLUSION

The Proof of Claim lacks any legal purpose or factual support and is presented solely to needlessly increase the costs of litigation and harass the PETITIONER.  Failure to withdraw the Proof of Claim in the time allotted by the "Safe Harbor" notice is grounds to seek sanctions under Bankruptcy Rule 9011.

WHEREFORE THE PETITIONER respectfully request that this court award:

1)   Attorney's Fees and Costs in Bringing this Motion;

2)   Monetary Sanctions in an amount sufficient to deter repetition of such conduct or comparable conduct by others similarly situated;

3)   Appropriate penalty to the Court;

4)   Withdrawal of the subject proof of Claim;

5)   Withdrawal of other similar proof of claims filed in this district;

6)   Directive that RESPONDENT can not file any more proof of claims in this district unless such proof of claim contains evidentiary support, as required under Bankruptcy Rule 3001, that the claim arises within applicable statutes of limitations.

---

[4] See *In re M.A.S. Realty Corp.*, 326 B.R. 31, 2005 Bankr. LEXIS 1173, 44 Bankr. Ct. Dec. (LRP) 270, 62 Fed. R. Serv. 3d (Callaghan) 223 (Bankr. D. Mass. 2005),   *Brewer v. Erwin & Erwin, P.C. (In re Marquam Inv. Corp.),* 188 B.R. 434, 1995 U.S. Dist. LEXIS 16630 (D. Or. 1995),   *Lenior v. GE Capital Corp. (In re Lenior)*, 231 B.R. 662, 1999 Bankr. LEXIS 210 (Bankr. N.D. Ill. 1999),   *In re Hamilton*, 104 B.R. 525, 1989 Bankr. LEXIS 1416, 19 Bankr. Ct. Dec. (LRP) 1208, 14 Fed. R. Serv. 3d (Callaghan) 1383 (Bankr. M.D. Ga. 1989),   *In re McAllister,* 123 B.R. 393, 1991 Bankr. LEXIS 50, 21 Bankr. Ct. Dec. (LRP) 405 (Bankr. D. Or. 1991)

1    7)    Such further relief as the court deems appropriate and proper under the circumstances.

2

3    Dated:    October 29, 2007                    Respectfully submitted,

4                                                  **DOAN, LEVINSON, & LILJEGREN, LLP**

5

6                                                  By:    /s ecf Michael G. Doan

7                                                  Michael G. Doan, Attorney for PETITIONER(S)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

*2007 Bankr. LEXIS 3330, **

IN RE: Gerald A. Wingerter and Janet G. Keller-Wingerter, DEBTOR(S).

CASE NO. 06-50120, CHAPTER 7, (converted from Chapter 13)

UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

2007 Bankr. LEXIS 3330

October 1, 2007, Decided

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Claimant, an assignee of a purported claim against Chapter 7 debtors, was ordered to show cause why sanctions and other consequences authorized by Fed. R. Bankr. P. 3001 and 9011 were not properly imposed upon the assignee in connection with its filing of a proof of claim (POC) that was later revealed to be wholly without any substantiation.

**OVERVIEW:** In reliance on an item in a bankruptcy claim portfolio that it purchased, the assignee filed a POC against debtors but failed to attach the required documentation. Nor did it ever substantiate that the POC represented an actual obligation of debtors. Debtors objected, and the court, sustaining the objection, denied the assignee's request to withdraw the POC, instead ordering the assignee to file corroborating proof. The assignee ultimately conceded that it had no such proof, but it then withdrew the claim despite the court's directive. At the ensuing hearing to show cause, the court held that the assignee had failed to comply with its Rule 9011 obligation to make a reasonable prefiling inquiry, thereby violating Rule 9011; that the assignee, by filing a POC that contained errors and omissions, had little concern for its duty to evaluate the claim's validity and to accurately convey it; that the assignee had improperly relied on language in agreements with assignors as to the POC's alleged validity; and that neither 11 U.S.C.S. § 502 nor Fed. R. Bankr. P. 3001 afforded a defense. Though warning the assignee against further infractions, the court declined to impose further sanctions.

**OUTCOME:** The court concluded that the assignee did not fulfill its obligations under Rule 9011 or Rule 3001 but declined to impose sanctions thereunder because of the already-incurred expense to the assignee of the proceedings to show cause. The court also concluded that the assignee violated Fed R. Bankr. P. 3006 by withdrawing the claim without first obtaining leave but that no sanctions would be imposed.

**CORE TERMS:** proofs of claims, originating, assignee, scheduled, warranty, declaration, assigned, portfolio, purchaser, attach, purported, consumer, claimant, seller's, purchase agreement, supporting documents, reasonable inquiry, withdrawal, trading, bankruptcy cases, documentation, mortgage, claim filed, attorneys' fees, enforceability, transactional, purportedly, withdraw, reliable, entity

## LEXISNEXIS(R) HEADNOTES

10/29/2007

Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Practice & Proceedings > Professional Responsibility
Contracts Law > Performance > Assignment > General Overview
Contracts Law > Secured Transactions > Installment Contracts > Assignments

*HN1* Where a debtor in bankruptcy has not scheduled any debt or obligation resembling a claim that has purportedly been assigned to a third party claims purchaser and which that purchaser wants to file in the debtor's case, the claim purchaser needs to discharge its obligations under Fed. R. Bankr. P. 3001 and Fed. R. Bankr. P. 9011 at the time it files a proof of claim. The assignee is not permitted to shift the expense of the initial examination of claims to other interested parties such as trustees or debtors. More specifically, when a debtor has not scheduled any claim listing the originating creditor or any direct or indirect assignee of the originating creditor, Rule 9011 requires a claims purchaser, before filing a proof of claim with the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, to obtain originating documents or, when such documents are not available, a clear understanding of the nature of the original dealings that support the assertion of a claim against the particular debtor. Having obtained those documents or that clear understanding, the claim purchaser should then attach to the proof of claim form the originating documents or an affidavit explaining the non-availability of such "media" to the proof of claim form so the debtor and other interested parties are given fair notice of the source and particulars of the claim.

Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN2* See Fed. R. Bankr. P. 9011(b).

Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN3* Fed. R. Bankr. P. 9011(b) focuses upon the circumstances surrounding the filing of a document that is later subjected to Rule 9011 scrutiny.

Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN4* The reasonable inquiry that Fed. R. Bankr. P. 9011(b) requires on the part of an assignee of a consumer claim before filing a proof of claim in that debtor's bankruptcy requires consideration of whether the debtor has included a related claim in its schedules. This rule does not apply where the debtor has admitted an original indebtedness by scheduling the originating creditor or one of its assignees in its bankruptcy filings. However, when the claim asserted by an assignee is not reflected in the debtor's schedules and the assignee has only bits of data that have not been warranted, the assignee needs to consider what, if anything, supports its current right to assert a claim.

Bankruptcy Law > Claims > General Overview
Bankruptcy Law > Claims > Proof > General Overview
Criminal Law & Procedure > Criminal Offenses > Fraud > General Overview
Criminal Law & Procedure > Criminal Offenses > Fraud > Bankruptcy Fraud > General Overview

*HN5* Official Bankr. Form 10 was developed to promote efficient communication by a claim holder of its rights against the debtor. If a purported claim holder cannot articulate the minimal amount of information called for in Official Form 10, it needs to read the legend at the bottom of that form, which states that the penalty for presenting a fraudulent claim is a fine up to $ 500,000 or imprisonment for up to 5

years, or both. 18 U.S.C.S. §§ 152 and 3571.

Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties
Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > General Overview
Bankruptcy Law > Discharge & Dischargeability > Nondischarge of Individual Debts > Unscheduled Debts
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN6* An emphasis in the Fed. R. Bankr. P. 9011 analysis on whether debtors in bankruptcy have scheduled an obligation to an entity in the chain of the claim assignments is well justified. Debtors have a strong incentive to list all known creditors because under 11 U.S.C.S. § 523(a)(3), the failure to include a known creditor can exempt that creditor from any discharge issued in favor of the debtors. Thus, where a debtor does not include in its schedules a claim that bears any resemblance to a claim that a purported assignee is contemplating asserting in the debtor's bankruptcy, the assignee of that claim needs to note that red flag. The optimal response to such a red flag would be to obtain and review the originating documents prior to filing a proof of claim.

Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Claims > Proof > Effects & Procedures

*HN7* Fed. R. Bankr. P. 3001(a) states that a proof of claim shall conform substantially to the appropriate Official Form. Rule 3001(c) specifies that, when a claim is based on a writing, the original or a duplicate shall be filed with the proof of claim. It further states that if the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

Bankruptcy Law > Claims > General Overview
Bankruptcy Law > Claims > Allowance
Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Claims > Proof > Effects & Procedures

*HN8* A claimant's filing, in a bankruptcy proceeding, of an incomplete proof of claim form when that form contains instructions on how to fill it out with which the claimant has not complied may be evidence that the claimant neglected its obligations under Fed. R. Bankr. P. 3001, resulting in sanctions against the claimant.

Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Claims > Proof > Effects & Procedures
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN9* A third party purchaser of consumer claims that operates wholly within the bankruptcy arena is properly expected to require its assignors to provide sufficient information to complete Official Bankr. Form 10 and thus to comply with Fed. R. Bankr. P. 9011.

Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Claims > Proof > Effects & Procedures

*HN10* A policy of filing a proof of claim without having possession of the supporting documents but withdrawing the claim if the debtor subsequently files an objection to the claim's validity smacks of gamesmanship, and creates an unacceptable risk that distributions to other creditors will be unfairly reduced.

Bankruptcy Law > Claims > Proof > General Overview

Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN11* Proofs of claim filed in a bankruptcy court must meet the standards of Fed. R. Bankr. P. 9011.

Bankruptcy Law > Claims > Allowance

*HN12* In the absence of an objection, a claim is deemed "allowed" for purposes of the proceeding. 11 U.S.C.S. § 502(a).

Bankruptcy Law > Claims > General Overview
Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Claims > Proof > Effects & Procedures
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN13* In the U.S. Bankruptcy Court for the Northern District of Ohio, Eastern Division, the filing of a proof of claim is clearly subject to review under Fed. R. Bankr. P. 9011.

Bankruptcy Law > Claims > Allowance
Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Claims > Proof > Effects & Procedures
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN14* Rules of claim administration created by 11 U.S.C.S. § 502(a) and Fed. R. Bankr. P. 3001--and the case law developed under those authorities--are not dispositive of the question, under Fed. R. Bankr. P. 9011, whether the form of a proof of claim and its attachments (or lack thereof) creates prima facie evidence of a claim. Nor do those rules control the question of whether, under certain circumstances, it was reasonable for the assignee of a consumer claim to file a claim in a debtor's bankruptcy in the first place.

Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN15* With regard to Fed. R. Bankr. P. 9011, the U.S. Court of Appeals for the Sixth Circuit has stressed the deference that should be given to a bankruptcy court in assessing whether a Rule 9011 violation exists and, if so, what sanctions should be imposed, and it has also adopted the proposition that because the bankruptcy court judge is on the front lines of bankruptcy litigation, it clearly is the judicial actor best positioned to decide the issue.

Bankruptcy Law > Claims > Proof > General Overview
Bankruptcy Law > Claims > Proof > Content, Evidence & Form
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN16* A third-party purchaser of a consumer claim does not fulfill its obligations under Fed. R. Bankr. P. 9011 if it files a proof of claim in that consumer's bankruptcy case without having possession of the underlying transactional documents or any reliable proxy for such documents. The U.S. Bankruptcy Court for the Northern District of Ohio, Eastern Division, views the filing, without review of originating documents, of a proof of claim by an assignee/purchaser as falling short of the reasonable inquiry required by Rule 9011 when the obligation has not been scheduled by the debtors and the purchase of the claim was not accompanied by reliable representations of claim validity.

**COUNSEL:**  [*1] For Gerald A. Wingerter, Uniontown, OH, Janet G. Keller-Wingerter, aka, Janet G. Keller, Uniontown, OH, Debtors: Chris G Manos, Akron, OH.

Trustee: Kathryn A Belfance, Akron, OH.

**JUDGES:** MARILYN SHEA-STONUM, U.S. Bankruptcy Judge.

**OPINION BY:** MARILYN SHEA-STONUM

 **OPINION**


OPINION RESOLVING SHOW CAUSE ORDER ENTERED MARCH 8, 2007

**INTRODUCTION**

Over the last two decades, there has been an exponential increase in trading of claims against debtors who have filed bankruptcy petitions. Once a fairly low-volume activity restricted to chapter 11 cases (and primarily undertaken to achieve strategic influence in chapter 11 cases), claims trading now also routinely occurs through the purchase and sale of "claims portfolios" in consumer cases:

> The market in creditors' claims has matured dramatically in recent years. Claims of all kinds are traded frequently in small and large workouts and bankruptcy cases. Although institutional and trade creditor debt are most commonly perceived as the subject of claims trading, even Chapter 13 consumer debts and Chapter 7 debts have become the targets of investors.

*Business Workouts Manuals,* § 25.3 (2007 Thomson/West). *See also* Siegel, *Introduction: ABI Guide To Trading Claims In Bankruptcy,* ABI Committee  [*2] On Public Companies And Trading Claims ("Perhaps nothing has changed the face of bankruptcy in the last decade as much as the new found liquidity in claims").

Undoubtedly contributing to the extraordinary growth of an industry devoted to the purchase and sale of claims in consumer cases is the implementation of electronic case filing ("ECF") and earlier technological developments in bankruptcy courts such as PACER ("Public Access to Court Electronic Records"). Prior to these innovations, firms engaging in the business of providing information on new bankruptcy filings routinely sent people to each bankruptcy court on a daily or weekly basis to compile lists of newly-filed petitions. Thus, although the fact of a petition filing and all pleadings filed in each case have always been matters of public record, ECF makes identifying individual debtors markedly simpler than in the era of paper filing. In the ECF age, search firms need only do a computer search for each bankruptcy court location throughout the country. Reportedly those searches have been further simplified through proprietary software programs that perform the search with limited human attention.

The ECF system also streamlines  [*3] the filing of proofs of claims for claims purchasers. No longer does a creditor need to mail an original hard copy for filing, nor does it need to request return of filed-stamped copies of the document.

This opinion examines the standard operating procedures of one creditor whose entire business centers on purchasing and filing of bankruptcy claims and the receipt of dividends on account of such claims [1]: what information did that creditor possess before filing its proof of claim and what information did it choose to disclose or withhold in the process of filing that document? The creditor would have this and other bankruptcy courts accept "industry standards" as excusing its noncompliance with Federal Rule of Bankruptcy Procedure 3001 [2] and the requisite full completion of the official form adopted in conjunction with that Rule. Thus, this case poses the central question whether an industry that has grown up solely to operate within the bankruptcy system can expect courts to ignore procedural rules that were in place prior to the birth of the industry because compliance with those rules would not promote maximum efficiency for the claims trading industry.

**FOOTNOTES**

1 The web site for B-Line, LLC,  [*4] whose filing of a proof of claim occasions the present opinion, provides a glimpse of the magnitude of claims purchases in consumer bankruptcies; it also reflects that many of the

steps undertaken to recover on bankruptcy claims are automated:

> B-Line, LLC ("B-Line") is one of the leading purchaser [sic] of consumer bankrupt accounts in the United States. Since our founding in 1997, we have purchased and serviced more than $ 45 billion of bankruptcy receivables.
>
> B-Line purchases secured and unsecured consumer debt included in both chapter 7 and chapter 13 cases throughout the nation. We purchase existing portfolios of previously filed bankrupt accounts ("bulk") and future bankrupt accounts as their filings occur ("forward flow").
>
> Our corporate office is staffed with knowledgeable and experienced professionals who utilize our proprietary processing system to manage over 9,000,000 accounts and process more than 125,000 new accounts per month.

http://www.blinellc.com/main.htm.

2 Reference to any Federal Rule of Bankruptcy Procedure in the remainder of this opinion shall simply refer to "Rule" and the appropriate rule number.

In 2006, B-Line purchased, at a significant discount, a portfolio of [*5] alleged bankruptcy claims that led B-Line to file a claim against Debtor Gerald Wingerter, purportedly originating from Mr. Wingerter's dealings with GTE. As described more fully below, when the Debtors objected to B-Line's proof of claim, B-line first asked for an extension of time purportedly to locate originating documents that it promptly decided not to pursue. Some months later and long after it was clear that no such documents could be obtained, B-Line purported to withdraw its proof of claim, ignoring a specific court order as well as Rule 3006. That B-Line admitted it did not have any original documents evidencing an alleged debtor-creditor relationship between GTE and Mr. Wingerter nor any understanding of the purported dealings between those parties raised, from the Court's perspective, serious questions whether the advent of bulk claims purchasing in consumer cases is accompanied by sufficient assurances that valid claims existed in the files of an originating creditor, or its assignee. Phrased differently, when the purported originating creditor or one of its assignees is not listed on the debtor's schedules, should a claims purchaser be allowed to file its claim first [*6] and look for originating documents later? With these concerns in mind, the Court issued a show cause order to B-Line. B-Line presented evidence both with respect to the processing of the specific proof of claim filed in the Wingerter case and its standard procedures in filing claims in bankruptcy cases.

The Court concludes that, *HN1* particularly where a debtor has not scheduled any claim resembling the purportedly assigned obligation that a claims purchaser wants to file in the debtor's case, the claim purchaser needs to discharge its obligations under Rule 3001 and Rule 9011 at the time it files a proof of claim. The assignee should not be able to shift the expense of the initial examination of claims to other interested parties, e.g., chapter 7 trustees and chapter 13 debtors and trustees. More specifically, the Court finds that when the debtors have not scheduled any claim listing the originating creditor or any direct or indirect assignee of the originating creditor, Rule 9011 requires a claim purchaser, before filing a proof of claim with a bankruptcy court, to obtain originating documents or, when such documents are not available, a clear understanding of the nature of the original [*7] dealings that support the assertion of a claim against the particular debtor. Having obtained those documents or that clear understanding, the claim purchaser should then attach to the proof of claim form the originating documents or an affidavit explaining the non-availability of such "media" to the proof of claim form so the debtor and other interested parties are given fair notice of the source and particulars of the claim.

## JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1) and by the Standing Order of Reference entered in this District on July 16, 1984.

## FACTUAL FINDINGS 3

### FOOTNOTES

3 This opinion shall serve as any findings of fact and conclusions of law that may be required under Rule 7052. To the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.

1. B-Line filed its proof of claim (the "B-Line POC") on March 17, 2006, which was 38 days after Gerald A. Wingerter and Janet G. Keller-Wingerter (the "Debtors") filed their chapter 13 petition. 4 The Official Form 10 used by B-Line as part of its proof of claim  [*8] (the "Form") indicates that it was prepared on March 13, 2006.

2. The "Notice of Chapter 13 Bankruptcy Case, Meeting of Creditors, and Deadlines" in the present case set June 14, 2006 as the deadline for filing proofs of claim. (Dkt. # 8).

3. The Form identifies the creditor as "B-Line, LLC/Covenant Management/GTE" and states that the basis for the claim is "money loaned."

4. The Debtors have not identified in their schedules any claim for B-Line, for any entity having a name including the words "Covenant Management," or for GTE.

5. The space for "Date debt was incurred" and "Charges made Prior to Filing" was left blank on the Form.

6. B-Line did not check the box under Part 5 of the Form asking whether the claim included interest or other charges in addition to the principal amount of the claim and instructing the claimant to "[a]ttach itemized statement of all interest or additional charges."

7. Part 7 of the Form contains the following instruction (all printer's marking is reproduced here substantially as in the Form itself):

> **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts,  [*9] court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. B-Line did not attach any documents to the Form that were contemporaneous with the creation of the claimed indebtedness between Mr. Wingerter and GTE, nor did B-Line provide any explanation why such supporting documents were not available.

9. Although the B-Line POC did not suggest that the originating support documents were voluminous, it only attached to the Form a single page containing the following information: Mr. Wingerter's name, the last four digits of his Social Security number, an address of "644 Star Drive," an "End Balance" of $ 431.57, an identification of the original creditor as GTE, and the last four digits of a "Related Account Number".

10. The Debtors filed an objection to the B-Line POC (Dkt. # 24) (the "Objection"). The Court scheduled an October 19, 2006 hearing on the Objection. On September 14, 2006, B-Line filed a response to the Objection seeking a sixty day extension of time "to obtain supporting documentation for its claims . because the Debtors  [*10] did not schedule the debt." (Dkt. # 29). No extension having been granted, the Court proceeded with the hearing as scheduled. At that initial hearing, the Debtors appeared with their counsel and represented to the Court that to their knowledge they did not have any indebtedness to GTE. The Court found and finds that this testimony from the Debtors was credible.

11. B-Line's local counsel, who participated in the initial hearing on very short notice, did not have any information relating to the B-Line POC. The Court therefore directed B-Line to find the documentation supporting its proof of claim and further stated that the Court was not going to simply allow B-Line to withdraw its claim. When B-Line's local counsel asked for confirmation that B-Line could not withdraw the claim, the Court responded:

> They cannot withdraw this claim. If they withdraw this claim without an explanation, I will report them to the U.S. Trustee.

The Court then adjourned the hearing until January 11, 2007.

10/29/2007

12. On January 3, 2007, B-Line through in-house counsel filed a "Notice of Withdrawal of Claim" specifically referring to Rule 3006. (Dkt. # 36). B-Line did not obtain any order of this Court authorizing the [*11] withdrawal of the B-Line POC, either under Rule 3006 or in relation to the Court's October 19, 2006 directive.

13. Approximately three hours before the scheduled January 11, 2007 hearing, B-Line filed an affidavit signed by Steven G. Kane (the "January Kane Affidavit") (Dkt. # 37), who identified himself as "operations manager" for B-Line. The Kane affidavit stated that B-Line had purchased the claim from Covenant Management Group, LLC ("Covenant") in March of 2006 and had filed the B-Line POC "[u]pon representation from Covenant Management that the debt on account xxxxxxxxxxxx 1221 is valid against Mr. Wingerter."

14. The January Kane Affidavit further stated that in response to the Debtors' objection, B-Line had on September 12, 2006 requested Covenant to supply GTE account statements and the signed account application, but subsequent to that request B-Line received "information that GTE, the original creditor, is unable to provide account statements and that the original application is no longer available."

15. According to documents later provided to the Court, B-Line informed Covenant on September 14, 2006 that it was rescinding its request for account statements and the original [*12] account application. Only after the October 19, 2006 hearing, when B-Line resumed its request for documentation, did Covenant inform B-Line that "media" for the Wingerter account was unavailable. [5]

16. The Court conducted the January 11, 2007 hearing and expressed concern that the B-Line POC may have been filed without basis. It subsequently entered an order setting a February 22, 2007 hearing and directing B-Line to "provide the Court with an explanation of its procedures regarding the due diligence it conducts to assure itself of the validity of a claim before filing a proof of claim." (Dkt. # 41).

17. Prior to the February 22, 2007 hearing, B-Line filed a written "Explanatory Statement," this time characterizing itself as "the assignee to [Covenant] of a GTE account." (Dkt. # 43). This document stated that B-Line relied upon the representations of Covenant in filing the B-Line POC, noted that the Debtors had scheduled a claim for Verizon Wireless, and argued that "[a]ccording to the information provided to B-Line from Covenant Management, the Debtors opened a GTE account in 1993, which maybe *[sic]* a Verizon account" because of a 2000 merger that resulted in the formation of Verizon [*13] Communications.

18. At the February 22, 2007 hearing, counsel to B-Line proffered portions of the Bankruptcy Receivable Forward Flow Purchase Agreement dated July 2, 2004 (the "Covenant/B-Line Forward Flow Agreement") with a request that this document be kept under seal. No other evidence was presented at that time.

19. On March 8, 2007, this Court entered a show cause order, (Dkt. # 44, the "Show Cause Order"). In the Show Cause Order, the Court noted that because B-Line files numerous claims in this and other bankruptcy courts, it was important to the integrity of the bankruptcy process that B-Line explain fully its routine for filing proofs of claim. The Show Cause Order raised the issue whether the Court should assess Rule 9011 sanctions against B-Line.

20. The Pre-hearing Brief filed by B-Line (Dkt. # 48) (the "Pre-hearing Brief") was accompanied by sworn declarations from Rui Pinto Cardoso, President and Chief Operating Officer of B-Line (the "Cardoso Declaration"), Steven G. Kane, the previously identified Operations Manager (the "Kane Declaration"), and Linh K. Tran, an in-house attorney for B-Line (the "Tran Declaration"); all of these were admitted into evidence at the Show [*14] Cause Hearing, which commenced on April 12, 2007 and, after testimony from Messrs. Kane and Cardoso, was adjourned to May 21, 2007 to give B-Line and Covenant an opportunity to present additional evidence. These two hearing sessions are referred to as the "Show Cause Hearing."

21. The Pre-hearing Brief stated that B-Line "received" the Wingerter Account on or about February 27, 2006. Pre-hearing Brief at 8; Cardoso Declaration at P 26. Therefore the B-Line POC was prepared roughly 15 days after B-Line became aware of the Wingerter account. According to the January Kane Affidavit, the transaction that actually assigned the claim to B-Line closed sometime in March, 2006. January Kane Affidavit, P 3.

22. The Pre-hearing Brief abandoned the theory that the GTE claim was somehow related to the Verizon Wireless claim scheduled by the Debtors, stating that "B-Line has not been able to locate any evidence substantiating its hypothesis that the Verizon Wireless debt scheduled by the Debtors is connected to the GTE debt purchased from Covenant." Pre-hearing Brief at 12; Cardoso Declaration at P 25.

23. According to the Pre-hearing Brief, B-Line generally receives the following information when [*15] it

purchases bankruptcy claims: "(i) the originating creditor's account number for the debtor, (ii) the debtor's name, (iii) the debtor's address and contact information, (iv) the debtor's social security number, (v) the pre-petition balance on the account, (vi) the charge off date, (vii) the account opening date, (viii) the name of the originating creditor, (ix) the bankruptcy case number, (x) the applicable Bankruptcy Code chapter, and (xi) the bankruptcy petition date." Pre-hearing Brief at 3; see also Cardoso Declaration at P 6.

24. The January Kane Affidavit and the document that B-Line introduced at the Show Cause Hearing as the "Covenant Computer File for the Wingerter Account" (hereinafter the "Covenant Computer File" [6]) described certain information that B-Line received from Covenant, including the address for a Mr. Wingerter at the time that the purported GTE account was opened. January Kane Affidavit at P 3; B-Line Show Case Hearing Exhibit S-2 at p. 1. That address was not the same as the address shown on the Debtors' chapter 13 petition.

25. The Covenant Computer File also indicated that the account sold to B-Line: (a) was opened on December 21, 1993; (b) originally had [*16] an unsatisfied balance of $ 289.65; (c) bore interest at seven percent; (d) had a current balance of $ 431.58; and (e) was charged off on December 17, 1996. Finally, it included a Social Security number that was the same as the last four digits of Mr. Wingerter's Social Security number. Exhibit S-2, Show Cause Hearing. Only item (d) was included in the document that B-Line attached as part of the B-Line POC.

26. Nothing in the Covenant Computer File explains how the seven percent interest rate was either selected or applied, nor did any evidence at the Show Cause Hearing address that issue. The Court notes that, using a simple interest method, the difference between the petition date balance set forth in the B-Line POC and the original balance set forth in the Covenant Computer file (which difference equals $ 141.93) does not tie to either the origination date of December 21, 1993, the charge-off date of December 17, 1996, or December 22, 2000, when (as set forth below) Covenant purchased a portfolio that purported to include a Wingerter account.

27. According to the testimony of Steven L. Souther, Covenant's Chief Executive Officer, Covenant believes that a partnership formed by Covenant [*17] was assigned a GTE claim against a Gerald Wingerter pursuant to a purchase agreement dated as of December 22, 2000, by and between Professional Recovery Systems, LLC ("PRS"), as seller, and Advantage Recovery Pool 12-2000 (a pool of funds from partnerships in which Covenant served as managing partner). Souther Transcript of testimony given on May 21, 2007 at 35. (The December 22, 2000 purchase agreement shall be referred to in the remainder of this opinion as the "PRS Purchase Agreement"). [7]

28. Covenant further believes that PRS did not obtain the alleged GTE claim directly from GTE, but rather from an intervening party that did make a direct purchase from GTE. Id. at 74-75.

29. Under the PRS Purchase Agreement, Covenant paid less than 25 cents on the dollar for each purchased claim.

30. As with the transaction between Covenant and B-Line, when Covenant purchased the PRS portfolio, Covenant received computer data from PRS on each alleged claim. The record, however, is not clear whether the complete Social Security number that is contained in the Covenant Computer File came from PRS. There was no direct testimony on that point and Mr. Souther said he was not positive whether Covenant [*18] provided third party bankruptcy services with Social Security numbers as part of Covenant's routine check to see whether any particular account had gone into bankruptcy. Souther Transcript at 78. Indeed, Mr. Souther testified that these bankruptcy inquiries were conducted by notifying Lexis Nexis that Covenant wanted information about bankruptcy filings by any individuals who appeared to match "any single line" of Covenant's computer data set. Souther Transcript at 78.

31. B-Line's Pre-hearing Brief further acknowledged the fluidity of the computer data set when it stated that computer files generated by the original creditor are "updated to reflect any payments, credits or other transactions" and "therefore represents the best and most current summary of the overall status of the purchased account." Pre-hearing Brief at 3; Cardoso Declaration at P 5.

32. In short, while it is clearly possible that the Social Security number associated with this assigned claim may have been passed from GTE to its immediate assignee to PRS to Covenant and finally to B-Line, it is also possible that this number became a part of the computer data set in some other fashion.

33. Covenant was never in possession [*19] of, or reviewed, originals or copies of any application by Gerald Wingerter for services from GTE or any signed agreement between those parties. Nor did Covenant possess or

review copies of any account statements mailed to Mr. Wingerter. Souther Transcript at 51.

34. The purported assignment from Covenant to B-Line of a claim against a Mr. Wingerter rests upon the Covenant/B-Line Forward Flow Agreement. [8] Under this agreement, B-Line periodically purchases accounts owned by Covenant as to which Covenant has been notified of a bankruptcy filing.

35. Under the Covenant/B-Line Forward Flow Agreement, B-Line paid substantially less than 14 cents on the dollar for the Wingerter claim.

36. Section 5.7 of the Covenant/B-Line Forward Flow Agreement, which is titled "Computer Files" states: "Seller has used reasonable efforts in accordance with industry standards to create Computer Files which set forth each Account designated in the Term Agreement, each of which meets the Eligibility Requirements as of the Cut-off Date." When trying to find a warranty or representation as to the validity of the claims acquired by B-Line from Covenant in the Covenant/B-Line Forward Flow Agreement, B-Line's counsel [*20] points to that section, arguing that it should be pieced together with the section on Eligibility Requirements. The Court finds, however, that there is no representation or warranty in the Covenant/B-Line Forward Flow Agreement as to the validity or enforceability of the claims summarized in the data transmitted from Covenant to B-Line.

37. Rather, if an account in the purchased portfolio is not valid, B-Line has a contractual remedy against Covenant, *i.e.,* B-Line is entitled to "reassign" the account to Covenant and to receive complete reimbursement of amounts paid by B-Line to Covenant with respect to that account. Covenant/B-Line Forward Flow Agreement, § 8.

38. B-Line concedes that the B-Line POC was in error when it asserted a claim for "money loaned."

39. At the time that B-Line filed its proof of claim, the chapter 13 plan proposed by the Debtors called for payment of a 100% dividend to holders of unsecured claims.

---

**FOOTNOTES**

[4] The Debtors have since converted their case to a proceeding under chapter 7 of the Bankruptcy Code.

[5] Indeed, the record evidence suggests that B-Line did not reiterate its request for documents until December. See B-Line Exhibit 13 (copy, redacted, of 12/28/2006 email [*21] from Courtney Lechner to Stephen Kane), April 12, 2007 Show Cause Hearing.

[6] In accord with requests from B-Line and Covenant, the Covenant Computer File, marked Exhibit S-2, was accepted into evidence under seal. In doing so, the Court made clear that is would afford B-Line protection against curious competitors and others who might wish to examine the contract, but that the Court would be free to reference any relevant information in documents so received as the Court deems necessary to its analysis of the issues before it.

[7] This document was also accepted under seal.

[8] Again, acceptance under seal of this document was subject to the Court's right to use relevant sections in the present opinion.

---

## DISCUSSION AND CONCLUSIONS OF LAW

### I. The B-Line POC and Rule 9011 Obligations

#### A. Rule 9011 Requires a Reasonable Inquiry Under the Circumstances

Rule 9011(b) provides as follows:

> HN2 **(b) Representations to the Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable [*22] under the circumstances,*

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack off information or belief.

(Emphasis Supplied)

The Court agrees with B-Line [9] that the filing of the B-Line POC was not undertaken for any improper purpose such as delay or harassment. Nor is subpart (b)(4) at issue in this matter. In the Court's view, however, Subparts (b)(2) and (3) raise more than colorable arguments that in filing its proof of claim, B-Line did not comply with its Rule 9011 obligation to make a reasonable pre-filing inquiry.

**FOOTNOTES**

[9] B-Line  [*23] Post-Hearing Brief at 22.

**B. The Circumstances Surrounding the Filing of the B-Line POC**

As quoted above, *HN3* Rule 9011(b) focuses upon the *circumstances* surrounding the filing of a document that is later subjected to Rule 9011 scrutiny. With respect to the B-Line POC, there are several circumstances that significantly trouble this Court and suggest that B-Line did not make the requisite reasonable inquiry before filing the B-Line POC.

**1. There Was No Related Claim on Debtors' Schedules**

The Court finds that *HN4* reasonable inquiry on the part of an assignee of a consumer claim before filing a proof of claim requires consideration of whether the debtor has included a related claim in its schedules. This opinion does not deal with cases in which the debtor has admitted an original indebtedness by scheduling the originating creditor or one of its assignees in its bankruptcy filings. When the claim asserted by an assignee is not reflected in the debtor's schedules and the assignee has only bits of data that have not been warranted, the assignee needs to consider what, if anything, supports its current right to assert a claim. *HN5* Official Form 10 was developed to promote efficient communication by a claim  [*24] holder of its rights against the debtor. If a purported claim holder cannot articulate the minimal amount of information called for in Official Form 10, it needs to read the legend at the bottom of that form. [10] The Rule 9011(b)(2) issue in this case is B-Line's assertion that Section 502 of the Bankruptcy Code should be read as allowing it to file an unsubstantiated claim, thereby transferring its Rule 9011 inquiry obligation to other interested parties.

**FOOTNOTES**

[10] "Penalty for presenting fraudulent claim: Fine of up to $ 500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571."

*HN6* An emphasis in the Rule 9011 analysis on whether the debtors have scheduled an obligation to an entity in the chain of the claim assignments is well justified. Debtors have a strong incentive to list all known creditors because under Section 523(a)(3) of the Bankruptcy Code the failure to include a known creditor can exempt that creditor from any discharge issued in favor of the debtors. Where, as here, the debtor does not include in its schedules a claim that bears any resemblance to the purportedly assigned claim, claim assignees need to note that red flag. The optimal response to such a red flag [*25] would be to obtain and review the originating documents prior to filing a proof of claim. *Compare In re Moreno,* 341 B.R. 813 (Bankr. S.D. Fla. 2006) (type of documentation necessary to satisfy Rule 3001(c) will vary depending on the nature of the objection and whether the debt has been scheduled; where debtor contests existence of any related indebtedness, creditors may need to attach original account agreement or copies of account statement to obtain *prima facie* case under Rule 3001).

This analysis requires creditors such as B-Line as an initial matter to review the debtor's schedules to determine whether the debtor has scheduled a claim that resembles the assigned claim. In the ECF age, access to that information is freely available to B-Line. [11] B-Line's description of its current protocols, Post-Hearing Brief (Dkt. # 72) at 7, [12] could be read as saying that such action is already undertaken by B-Line, although the described protocols actually seem to focus only on proofreading.

---

**FOOTNOTES**

11 The Court is confident that B-Line will find and implement a technology that allows efficient review of debtors' schedules. As one court has commented in an opinion unrelated to the issues here: "An entity, [*26] such as B-Line, that is sophisticated enough to figure out how to make a profit on bankruptcy claims is correlatively charged with being sophisticated enough to know how to navigate through bankruptcy procedure." *In re Barker,* 306 B.R. 339, 348 (Bankr. E.D. Cal. 2004).

12 "Prior to actually filing a proof of claim with the court, B-Line conducts additional physical diligence on the draft claim to confirm the accuracy of several data points, including a final check that the name, address, account number, case data, originating creditor name and account balance reflected on the claim are all consistent with the information contained in the applicable Computer File and ECF/Pacer for such claim. Only after confirming that its draft claim conforms to the information contained in the Computer File and ECF/Pacer will B-Line file its proof of claim for that account." (Record citations omitted).

---

### 2. Errors and Omissions on B-Line's POC; Disregard for the Provisions of Rule 3001.

*HN7* Rule 3001(a) states that a proof of claim "shall conform substantially to the appropriate Official Form" and Rule 3001(c) specifies that when a claim is based on a writing, "the original or a duplicate shall be filed with [*27] the proof of claim." "If the writing has been lost or destroyed," Rule 3001(c) continues, "a statement of the circumstances of the loss or destruction shall be filed with the claim." On B-Line's Form, B-Line provided neither the originating documents nor a Rule 3001(c) statement of any circumstances precluding B-Line from attaching those documents as part of its claim. Moreover, B-Line characterized the assigned claim as for "money loaned," did not provide the requested date on which the claim arose or any available information regarding the claim's vintage, and did not answer the specific question whether interest or other surcharges were included in the claim. Information that could have corrected all three of these mistakes was included in the Covenant Computer File, but apparently B-Line's automated filing processes did not entail utilizing that information to produce an accurate proof of claim. Apparently, the "physical diligence" performed on the B-Line POC resulted in B-Line personnel determining that the omission of this data was "consistent with the information contained in the [Covenant Computer File]."

These errors and omissions by B-Line suggest, at best, [13] that B-Line [*28] had little concern for evaluating the validity of its asserted claim or for conveying its claim accurately to the Debtors or other interested parties. [14] *HN8* "A claimant's use of a proof of claim form that contains instructions on how to fill it out may be evidence that the claimant 'neglected [its] obligations to make reasonable inquiry' before filing the claim, resulting in sanctions against the claimant." *In re Dansereau,* 274 B.R. 686 (Bankr. W.D. Tex. 2002), *aff'd sub nom Cash-N-Advance v. Dansereau,* 64 Fed. Appx. 417 (5th Cir. Tex. 2003), *quoting Lenior v. GE Capital Corporation (In re Lenior),* 231 B.R. 662, 672 (Bankr.N.D.Ill.1999). [15]

---

**FOOTNOTES**

13 At worst, the omission in the B-Line POC of the information in the Covenant Computer File relating to the date of the account opening (1993) and the date the originating creditor "charged off" the claim (1996) could be read as a decision to obscure enforceability issues such as the statutes of limitations and laches. Because Mr. Pinto Cardoso has informed the Court that B-Line has changed its practices to include the date the claim arose on its Form 10 filings, and the Court credits that representation, the Court will not order any prospective relief [*29] concerning this practice.

14 A good portion of B-Line's briefings of this matter addressed B-Line's processes for ensuring that proofs of claim are not filed for claims that a debtor discharged in a prior bankruptcy proceeding. See Post-Hearing Brief at 6-7. The adequacy of B-Line's internal processes for determining whether any particular claim has been previously discharged simply does not address the question here, namely whether B-Line made a reasonable inquiry whether it, through a chain of assignments, had a valid claim in the type and amount asserted in the B-Line POC. Similarly the steps B-Line takes to ensure that its proofs of claim are filed with the proper case number and spelling of the debtors' names, id. at 7, while appropriate quality control procedures for its business, are not germane to the issue at hand.

15 Ironically, B-Line points to In re Anne Strong, Case No. 06-51173 on this Court's docket, as "confirmation of the integrity and effectiveness of B-Line's systems." Post-Hearing Brief at 17. Although in Strong B-Line was able to produce copies of account statements in response to the debtor's objection to its claim, as a part of its review of those documents B-Line [*30] decided that it should amend its proof of claim to reduce the amount from the $ 11,649 originally claimed to $ 8,206. As with the Chapter 13 plan proposed by the Wingerters, Anne Strong's plan calls for a 100% dividend to unsecured creditors. It therefore was cost-effective for debtors' counsel in these cases to incur additional attorneys' fees in objecting to the B-Line claims. Where Chapter 13 debtors propose a "pot plan" or in a chapter 7 asset case, however, there is diminished incentive for debtors or knowledge for trustees to object to claims.

The drafters of Official Form 10 had good reason to require claimants who are generally in the position of having historical information to communicate such information succinctly and accurately on that form. If B-Line chose to accept assignments of claims without obtaining adequate historical information, that is a problem of its own making. *HN9*Since B-Line operates wholly within the bankruptcy arena, it should be expected to require its assignors to provide sufficient information to complete Official Form 10 and thus to comply with Rule 9011. Given that the typical consideration paid for assigned claims is a percentage of the face amount [*31] of the purported claim, absent some warranty by the assignor as to the accuracy of the claim amount, as well as to validity and enforceability of the claim, certainly one can posit many reasons that the information might be inaccurate. Again without appropriate warranties, the transferee has placed itself in a difficult, if not impossible position in terms of satisfying its Rule 9011 obligations.

### 3. B-Line's Haste in Filing Its Claim

The haste with which the asserted Wingerter claim was transferred to B-Line is also a circumstance that the Court considers relevant to the Rule 9011 inquiry. Had B-Line taken the time to compare all of the information in the Covenant Computer File to the information requested by Official Form 10, it presumably would have recognized that (a) a component of its claim was based upon interest or other surcharges and (b) information would have been available regarding the date that the claim was incurred. The claims deadline in the Wingerter proceeding certainly did not demand the rapid filing made by B-Line. B-Line could and should have used more of the filing period to attempt to obtain supporting documents **prior** to filing its claim. It was not until after the Debtors [*32] filed the Objection that B-Line requested Covenant provide statements and an application in support of the B-Line POC. *HN10*A policy of filing a proof of claim without having possession of the supporting documents, but withdrawing the claim if the debtor subsequently files an objection to the claim's validity smacks of gamesmanship and creates an unacceptable risk that distributions to other creditors will be unfairly reduced. Perhaps further evidence of this gamesmanship is the decision by B-Line to cancel its request for documents in support of the claim at 9:32 a.m. on September 14, 2006 and yet later that same day to file with the Court a request for an extension of time purportedly to allow the opportunity to locate supporting documents.

### 4. The Lack of Meaningful Representations on Claim Validity in the Chain of Assignment

B-Line argues that it reasonably relied on representations Covenant made to B-Line that the claim against Mr. Wingerter was valid. Review of the transactional documents by which Covenant and B-Line obtained their interest

in the asserted claim against Mr. Wingerter reveals no such representations.

When Covenant purchased the relevant asset portfolio from PRS in 2000,  [*33] the purchase agreement did not contain any representation regarding the validity of any account claim; indeed, that document does not contain a paragraph for **any** representations or warranties by the seller. [16] The PRS Purchase Agreement placed upon Covenant the obligation to determine within 90 days after the Closing Date whether any accounts were invalid. PRS Purchase Agreement P 4. The document designates invalid claims as "Ineligible Accounts," which are further defined as "any Account which has become uncollectible, prior to the Closing Date, because (i) the customer voluntarily or involuntarily becomes subject to bankruptcy proceedings; (ii) the account has been fraudulently used; (iii) the customer was deceased prior to Closing Date; or (iv) any other reason which makes the account legally uncollectible, provided that such circumstances occurred prior to the date of the closing hereunder. Id. at P 1 (Definitions). There was no evidence that Covenant conducted a systematic review of the claims during the 90-day post-closing window. In fact, the testimony of Mr. Souther suggested that Covenant relied heavily on its belief in the accuracy of the PRS computer data. Souther Transcript  [*34] at 47 ("We assume if we make purchases from [PRS], that they're good purchases"). [17]

---

**FOOTNOTES**

[16] Paragraph 8 of the PRS Purchase Agreement does contain a seller's indemnification, but the obligation is limited to losses resulting from "willful misconduct or violation of applicable law, rule or regulation by Seller (or its employees or agents) in connection with the collection or enforcement of the Purchased Accounts prior to the Closing Date."

[17] No evidence was produced to demonstrate that PRS, apparently the second assignee of this claim, had received any contractual assurances of the validity of the claim, nor was there any evidence of any due diligence done by PRS that would support this exercise of faith by Covenant.

---

Nor did the Covenant/B-Line Forward Flow Agreement contain anything substantive in the way of Seller's representations and warranties. After setting forth representations unrelated to the validity of the accounts in the claims portfolio, Paragraph 5.7 of the document provides:

> 5.7 Computer Files. Seller has used reasonable efforts in accordance with industry standards to create Computer Files which set forth each Account designated in the Term Agreement, each of which meets the  [*35] Eligibility Requirements as of the Cut-Off Date.

The Court finds that this language falls well short of a representation or warranty of the validity of each account in the portfolio being assigned to B-Line. The point of reference in the contractual language is not the requirements of the Bankruptcy Code and Rules, but rather "industry standards" regarding the creation of Computer Files.

Mr. Souther, the Covenant representative, agreed that he did could not find any contractual provision in the Covenant/B-Line Forward Flow Agreement warranting the validity of the transferred assets. Souther Transcript at 83-88. More importantly, Covenant lacked any foundation to give the representation that B-Line now asks the Court read into the Covenant/B-Line Forward Flow Agreement: Covenant had never seen supporting transactional documents and PRS never provided Covenant with any representation regarding claim validity. Finally, many of the "Eligibility Requirements" contained in Paragraph 9 of the Covenant/B-Line Forward Flow Agreement are **defined** as of the "Claim Verification Date" (which is a date 45 days after the closing) or as of the Closing Date, but the representation and warranty in Paragraph  [*36] 5.7 is made "as of the "Cut-Off Date," which is that pre-closing day on which Covenant created computer files for delivery to B-Line.

B-Line cites In re Cassell, 254 B.R. 687, 691 (B.A.P. 6th Cir. 2000) for the proposition that it is reasonable to rely upon information received from third parties in undertaking a Rule 9011 investigation. [18] That opinion, however, stressed that the claimants who executed an amended proof of claim "relied on the personal knowledge of the third claimant (their brother) who was primarily responsible for the rental relationship [that gave rise to the amended claim]." Id. at 692. Similarly, the unreported opinion in H.J. Rowe, Inc. v. Spiegel, Inc. (In re Talon Holdings, Inc.), 1999 Bankr. LEXIS 256, 1999 WL 150337 (Bankr. N.D. Ill., 1999), cited by B-Line found that in filing a chapter 11 for a non-existent entity and removing state court litigation after the filing of that unfounded petition, a bankruptcy attorney reasonably relied upon statements by a second attorney who, having been charged by the client with merging two entities into a third, represented to the bankruptcy attorney that he had

completed the merger. 1999 Bankr. LEXIS 256, [WL] at 5. In contrast, in the present case neither B-Line nor Covenant can point to any actor [*37] who has personal knowledge that Debtor Gerald Wingerter has an unfulfilled obligation to GTE, nor has B-Line or Covenant produced any custodian for business documents evidencing such an obligation. [19] In the absence of anyone with such personal knowledge or reliable business records, and given that the Debtors did not schedule any obligation relating to GTE, the Court finds that a reasonable inquiry into the facts should have included possession and review of alleged transactional documents between Mr. Wingerter and GTE or some reliable proxy for those documents.

---

**FOOTNOTES**

[18] The *Cassell* opinion specifically states that HN11⚓"[p]roofs of claim must meet the standards of [Rule 9011]", 254 B.R. at 691, and it thus implicitly rejects B-Line's argument that claims analysis under Section 502 and Rule 3001 subsumes any Rule 9011 inquiry.

[19] B-Line does not argue that the Covenant Computer File constitutes a business record under Federal Rule of Evidence 803(6), presumably because there is no "custodian or other qualified witness" to testify that the information in the Covenant Computer File was prepared by a person with knowledge. Indeed, it appears from the record that several persons had the ability to amend [*38] or "update" the information in the Covenant Computer File without having personal knowledge of the claim.

---

### C. B-Line's Section 502 and Rule 3001 Defense

B-Line cites several cases stating that, under Rule 3001, the claim is not disallowed for failure to attach to Official Form 10 the relevant transactional documents but rather, at worst, simply loses its "prima facie" status and, at best, in accordance with judicial gloss even retains its prima facie status as a result of 11 U.S.C §502(a):

> HN12⚓In the absence of an objection, a claim is deemed "allowed" for purposes of the proceeding. *See* 11 U.S.C. § 502(a). Thus, under the governing statute, a claim is "good," for all bankruptcy-related purposes, when it is not subject to a pending objection.

B-Line Post-Hearing Brief at 20. See also *id.* at 3 ("If a claim is not subject to automatic disallowance in the Sixth Circuit for failure to attach supporting documents at the time of filing, then *a fortiori* such claim should not be subject to sanctions."). [20]

---

**FOOTNOTES**

[20] At least one recent case has concluded that claims **can** be disallowed for failure to attach supporting documentation where B-Line did not appear with any supplemental evidence in response to a trustee [*39] objection to B-Line's claim. *See In re Kirkland,* 361 B.R. 199, 2007 WL 118107 (Bankr. D.N.M., 2007). Also, the bankruptcy court in *In re Henry,* 311 B.R. 813 (Bankr. W.D. Wash. 2004), decided that it would apply the following rule: "a creditor must, at a minimum, file with its proof of claim form, but in no event later than in response to a claims objection by the debtor (i) a sufficient number of monthly account statements to show how the total amount asserted has been calculated, and (ii) a copy of the agreement authorizing the charges and fees included in the claim." *Id.* at 817-18. "In the absence of that minimum evidentiary presentation," the court continued, "the creditor's claim should be disallowed." *Id.* at 818.

---

HN13⚓In the Bankruptcy Court for the Northern District of Ohio, however, the filing of a proof of claim is clearly subject to review under Rule 9011. *See In re Cassell,* 254 B.R. 687 (B.A.P. 6th Cir. 2000) ("Proofs of claim must meet the standards of [Rule 9011]"); *In re Berghoff,* 2006 Bankr. LEXIS 1145, 2006 WL 1716299 (Bankr. N.D. Oh. 2006) (Court issued show cause order for mortgage lender who inadvertently continued to file proofs of claim that included pre-petition attorney fees, despite prior Court [*40] opinion in otherwise unrelated case that such attorney fees were not allowable; mortgage lender found to violate Rule 9011 by asserting claim not warranted by existing law). *See also In re Abramson,* 313 B.R. 195, 198 (Bankr. W.D. Pa. 2004) (Rule 9011 applies to claims filed in bankruptcy); *In re Dansereau,* 274 B.R. 686, 687 (Bankr. W.D. Tex. 2002) ("Rule 9011 applies to proofs of claim filed in bankruptcy cases").

In short, B-Line's *a fortiori* argument fails: HN14 rules of claim administration created by Section 502(a) and Rule 3001--and the case law developed under those authorities--are not dispositive of the Rule 9011 question. Whether the form of a proof of claim and its attachments (or lack thereof) creates prima facie evidence of a claim does not control the question whether *under the circumstances* it was reasonable for B-Line to file the claim in the first place. [21] In fact, since Official Form 10 contains a legend warning the filer of the severe penalties for the filing of a false claim, if this Court were to find that there is any *a fortiori* principle at work here, it is that claim assignees need a reliable basis for asserting a claim. Having paid a deeply discounted price to [*41] an assignor who provided no warranties as to the validity of the claim, the assignee has placed itself in a position where, at a minimum for Rule 9011 purposes, the assignee must review the claims scheduled by the debtor to ascertain whether the debtor has admitted such an obligation.

FOOTNOTES

21 So, for instance, in the *Berghoff* case, 2006 Bankr. LEXIS 1145, 2006 WL 1716299 (Bankr. N.D. Oh. 2006) the claims filed by the mortgage lender could be said to constitute "prima facie" claims for purposes of Rule 3001 or "deemed" claims under Section 502(a) (the note and mortgage were attached as part of the proof of claim) but those proofs of claim rightfully were still the focus of the Court's Rule 9011 show-cause order because the mortgage lender was asserting pre-petition attorney fees in the face of controlling precedent that such fees were not allowable. *See also In re Dansereau*, 274 B.R. 686 (Bankr. W.D. Tex. 2002), *aff'd sub nom Cash-N-Advance v. Dansereau*, 64 Fed. Appx. 417 (5th Cir. Tex. 2003) (Bankruptcy Court issued a show cause order in multiple bankruptcy cases to consider whether the creditor should be sanctioned for repeatedly filing general and unsecured claims as "priority" claims).

B-Line suggests that if [*42] this Court were to find a Rule 9011 violation, the Court would be impermissibly acting on a "hindsight" created by the fact that ultimately B-Line could not find any originating documents. B-Line's Post-Hearing Brief at 2 - 3. [22] That argument ignores the position in which B-Line placed itself. It filed a proof of claim based upon a line of data in a computer file as to which there was no representation or warranty regarding claim validity or enforceability. That B-Line chose to proceed without review of the claims scheduled by the Debtors is apparently a part of its conscious business model. In reviewing claims, courts are always in the position of acting in "hindsight." Within the context of this case however, this Court made it clear at the October 19, 2006 hearing that a practice of filing a proof of claim first and seeking evidence of the validity and enforceability of the claim later raised serious issues. At that time, B-Line had not yet informed the Court that it had been unable to find any originating documents.There is yet another flaw in B-Line's reliance upon the Rule 3001 and Section 502(a) cases: in most of those cases, the debtor had either (1) scheduled the assigned [*43] claim in the name of the originating creditor or an assignee or (2) objected to the form of the proof of claim without disputing the fact that the originating creditor had a valid claim in some amount. For example, B-Line cites at page 3 of its Post-hearing Brief the case of *In re Perron*, 350 B.R. 628 (BAP 6th Cir. 2006) (Table)[Reported in Full-Text format at 2006 Bankr. LEXIS 2639], an opinion not intended for publication. There the Court characterized the debtors' objections to claims as objections "in essence, that the [challenged] proofs of claim were technically insufficient because only account summaries were provided." 350 B.R. at 3, of Table Opinion [2006 Bankr. LEXIS 2639 at *2]. The appellate opinion stressed that the Schedule F filed by the debtors, which constituted an unsworn declaration under penalty of perjury, included obligations to the originating creditors in the approximate amount set forth on the proofs of claim filed by the claim assignees. *Id.* at 5, [2006 Bankr. LEXIS 2639, at *14]. This Court rejects B-Line's assertion that *Perron* stands for the proposition that 'the failure to attach this documentation to the claim is of no moment for Rule 9011 purposes." B-Line's Post-Hearing Brief at 4. The *Perron* opinion does not even refer to Rule 9011, let alone address whether bankruptcy [*44] courts may consider, as one of several Rule 9011 circumstances, that the claimant filed its proof of claim without having reviewed originating documents. That circumstance is especially troubling in the present case because, as set forth above, B-Line was not in direct privity with the originating creditor and there is no trail of representations or warranties that can be traced back through the various assignments.

FOOTNOTES

22 B-Line's Post-Hearing Brief cites *In re Downs*, 103 F.3d 472 (6th Cir. 1996) on the "hindsight" point. Post-Hearing Brief at 2-3. B-Line suggests that in *Downs* a bankruptcy court's opinion finding a Rule 9011 violation was overturned. *Id.* at 3 (sanctions overturned by appellate court because investigation was reasonable under the circumstances). To the contrary, the Sixth Circuit in *Downs* **affirmed the bankruptcy court's decision (1) not to impose Rule 9011 sanctions but (2) to order disgorgement of fees as a sanction.** The only

"overturning" of the bankruptcy court's opinion in *Downs* was the Sixth Circuit's decision that all, rather than part, of the attorneys fees should be discharged under the disgorgement case law. *HN15* The *Downs* opinion on the Rule 9011 issue stressed the [*45] deference that should be given to bankruptcy courts in assessing whether a Rule 9011 violation exists and, if so, what sanctions should be imposed. 103 F.3d at 480-81. The *Downs* opinion quoted *In re Cascade Energy & Metals Corp.,* 87 F.3d 1146 (10th Cir. 1966) for the proposition that "the bankruptcy court judge is on the 'front lines of [bankruptcy] litigation' and is clearly the 'judicial actor . . . better positioned than another to decide the issue in question'". In turn, *Cascade Energy* was quoting from the opinion of the United States Supreme Court in *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 403-04, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990).

## D. B-Line Violated Rule 9011 in the Present Case

This Court finds that *HN16* B-Line did not fulfill its Rule 9011 obligations in filing the B-Line POC without having possession of the underlying transactional documents or any reliable proxy for such documents. As a prospective matter, B-Line and other purchasers in the claims trading industry should understand that this Court views the filing, without review of originating documents, of a proof of claim by an assignee/purchaser to fall short of reasonable inquiry under Rule 9011 when the obligation has not been scheduled by the [*46] debtors and the purchase of the claim was not accompanied by reliable representations of claim validity. Because of the time and energy that B-Line's senior management devoted in response to this Court's show cause order, however, the Court does not view any further sanctions to be necessary in this case.

## II. The Withdrawal of the B-Line POC

Had B-Line's withdrawal of the B-Line POC, without first obtaining a court order as required by Rule 3006, been intended to divest this Court of jurisdiction over the B-Line POC, the finding of a further violation would have been appropriate. B-Line, however, has never objected to this Court conducting evidentiary hearings on the Rule 9011 issue, nor has it ever argued that the attempted withdrawal or any other event in this case moots the Rule 9011 question. Further, in her Declaration, Linh K. Tran, the in-house counsel who caused the claim withdrawal, states under oath that she interpreted descriptions relayed to her of the October 19, 2006 hearing as authorizing claim withdrawal as long as B-Line also filed a written explanation for the initial claim filing. Although Ms. Tran's interpretation was in error, under the circumstances the Court will [*47] not sanction B-Line for the Rule 3006 violation.

## CONCLUSION

Apparently lost in the fast-paced world of selling and purchasing bankruptcy claims has been attention to compliance with long-established bankruptcy procedures for filing proofs of claim. In addition, the buyers and sellers of such claims apparently often proceed with no representations or warranties as to the validity of the transferred claim. When debtors have not admitted, through their schedules, the validity of the claim in the hands of the originating creditor or any of its assignees, the filer should comply with Rule 3006 and complete Official Form 10 by taking the time to obtain and review originating documents before filing any proof of claim. If originating documents cannot be obtained, and the assignee decides to file a proof of claim notwithstanding the absence of such documents, the assignee must comply with Rule 3006 and Official Form 10 by providing a clear explanation (which would include all non-confidential information in the hands of the assignee) of how the initial obligation arose and setting forth the warranties and representations in the chain of transfers that the assignee relies upon in asserting its [*48] claim.

**IT IS SO ORDERED.**

**Dated: 04:54 PM October 01 2007**

MARILYN SHEA STONUM

U.S. Bankruptcy Judge